# CHARLESTON.

T. TOWLES & COMPANY · *v.* COUNTY COURT OF SUMMERS COUNTY.

Submitted November 6, 1923. Decided January 9, 1924.

1. HIGHWAYS—*Road-Grading Contractor Held Not Entitled to Recover for Unnecessary Work Beyond Lines Shown in Plan.*

Under a written contract for the grading of a road at a specified price per cubic yard, which provides that work done beyond the lines and grades shown on the plan or as given, except as therein provided, or any extra work done without written authority will be considered as unauthorized and at the expense of the contractor and will not be measured or paid for by the county, but that the contractor shall remove all breakage and slides, and that all excavation will be measured in its original position by the cross-section method to ascertain the amount of material removed, which cross-sections will include all breakage or slides removed, not attributable to carelessness on the part of the contractor, work done beyond the lines shown on the plan or rendered necessary by reason of deviation from the lines, without the authority of the county court or its duly authorized agent, is not to be measured, and the contractor can not recover therefor. (p. 317).

2. SAME—*Road Contractor Held Entitled to Payment for All Breakage and Slides Removed by Him, Not Occasioned by Carelessness.*

Where a contract between a contractor and a county court

for road excavation provides that all excavation will be measured in its original position by the cross-section method to ascertain the amount of material removed, which cross-sections will include all breakage or slides, not attributable to carelessness on the part of the contractor, the contractor is entitled to payment for all breakage and slides removed by him, due to the use of explosives in shooting the materials, unless they are caused by his carelessness, or unless he fraudulently uses excessive numbers or sizes of charges and thereby increases the yardage. (p. 317).

3.  SAME—*County Engineer's Monthly Estimates of Work Done and Materials Furnished Under Road-Grading Contract Held Not Conclusive on Contractor As to Quantities.*

Where the contract provides that the engineer shall determine among other things the amount and quantity of the several kinds of work performed and materials furnished which are to be paid for under the contract, and his estimate and decision shall be final and conclusive, and such estimates, in case any question shall arise, shall be a condition precedent to the right of the contractor to receive any money due under the contract; and that the engineer will make current monthly estimates of the work performed and materials furnished, upon which 90 per cent of the estimated whole is to be paid as the work progresses, there being no question as to the proper classification of the excavation as the work is done, the engineer's monthly estimates are mere "estimates" or approximations of the work done and materials furnished, and in the absence of express and unequivocal terms in the contract making them so, they are not final and conclusive on the contractor as to quantities. (p. 320).

4.  SAME—*Instruction that Monthly Estimates of County Engineer As to Work Done and Materials Furnished Cannot be Impeached, Except for Fraud, Mistake, or Caprice, Held Erroneous.*

Under such a contract the main purpose of the monthly estimates is to furnish a basis upon which monthly payments are to be made to the contractor; and in an action by the contractor for recovery of the balance claimed by him to be due for the excavation, the defendant claiming that he has been paid for all excavation done, after final estimate by the engineer but which payment was accepted under protest, it is error to instruct the jury that the monthly estimates cannot be impeached except for fraud, mistake, or caprice amounting to fraud on the contractor. (p. 321).

Error to Circuit Court, Summers County.

95 W. Va.

Action by T. Towles & Co. against the County Court of Summers County. Judgment for defendant, and plaintiff brings error.

*Reversed and remanded.*

*Poffenbarger, Blue & Dayton, R. F. Dunlap,* and *Robert E. McCabe,* for plaintiff in error.

*E. C. Eagle, T. N. Read, W. T. Ball,* and *A. A. Lilly,* for defendant in error.

*E. T. England,* Attorney General, and *Chas. Ritchie,* Assistant Attorney General, amici curæ.

MEREDITH, PRESIDENT:

Plaintiffs sued in assumpsit to recover the balance of the contract price on a contract for road work. The amount claimed was $10,306.88, with certain interest. The jury returned a verdict in their favor for $67.54, which the court refused to set aside on plaintiff's motion, and they assign error.

On July 18, 1919, plaintiffs entered into a written contract with defendant County Court for the permanent improvement of 26,400 lineal feet of what is known as the Pipestem Road. They completed 9750 feet of it and were relieved from the remainder. No question arises as to the quality of the work; the completed portion was accepted and defendant claims that it was fully paid for, except the small amount found by the jury, due to error in calculation of the county engineer. The road was not to be hard-surfaced, but to be put on a grade, certain concrete work was to be done and certain metal drain pipe was to be furnished and put in place. All this was done. All work was to be done and all materials furnished at specified unit prices. The concrete work and metal drain pipe have been paid for. The sole controversy now arises over the amount of grading or yardage. The excavation was the chief item under the contract, as other items amount to only about $2000.00. Plaintiffs were to be paid 67 cents per cubic yard for the excavation and they claim that the total amount done was 68,708.8 cubic yards; defendant originally claimed the total yardage was

53,325.4, and that it had paid for that amount. During the trial, defendant admitted an error in its account of 100.8 cubic yards, and it was for this that plaintiffs obtained a verdict and judgment. The 53,325.4 yards and the 100.8 yards, or a total of 53,426.2 yards, is what defendant now contends is the correct yardage. The present difference in their figures is 15,282.6 cubic yards. This does not arise upon mere calculation of the actual amount of excavation, as plaintiffs clearly proved that they moved 68,708.8 cubic yards of material and this is not denied by defendant; but defendant shows plaintiffs have been paid for 53,325.4 yards, have judgment for the 100.8 yards, and presents the following defenses to their claim for the 15,282.6 yards:—(1) that the extra yardage, if any, was excavated for the convenience of the plaintiffs, by their going off or changing the designated route; (2) that it was due to plaintiffs' carelessness in shooting too heavy charges, thus causing unnecessary breakage and slides; and (3) that the estimates of the yardage made by defendant's engineer are binding and conclusive, and that he has found against this contention.

The contract is the standard form used at that time by the State Road Commission. The following sections of it are material upon this inquiry:

"32.  *Unauthorized work.*  Work done without lines and grades being given, work done beyond the lines and grades shown on the plan or as given, except as herein provided, or any extra work done without written authority will be considered as unauthorized and at the expense of the contractor and will not be measured or paid for by the county.  Work so done may be ordered removed and replaced at the contractor's expense."

"41.  *Use of explosives.*  Where the use of explosives is necessary for the prosecution of the work, the contractor shall use the utmost care, so as not to endanger life or property, and whenever directed the number and size of the charges shall be reduced."

"52.  *Line, Grade and Measurement Stakes.*  The Engineer will furnish and set all original grade, slope and line stakes.  The contractor shall furnish, free of charge, all additional stakes, all templets and other ma-

terials necessary for marking and maintaining points and lines given, and shall furnish the inspector such assistance as he may require in giving points and lines necessary to the prosecution of the work. The contractor shall be held responsible for the preservation of all stakes and marks and if in the opinion of the engineer, any of the survey stakes or marks have been carelessly or wilfully destroyed or disturbed by the contractor, the cost to the court of replacing them shall be charged against him and shall be deducted from the payment for the work. Finished surfaces, in all cases, shall conform with the lines and grades given as shown on the approved plans.''

''55. *Engineer to be referee.* To prevent misunderstanding and litigation, the engineer shall decide any and all questions which may arise as to the quality and acceptability of materials furnished and work performed and as to the manner of performance and rate of progress of said work and shall decide all questions which may arise as to the interpretation of any or all plans relating to the work and of the specifications, and all questions as to acceptable fulfillment of the contract on the part of the contractor; and the engineer shall determine the amount and quantity of the several kinds of work performed and materials furnished which are to be paid for under the contract, and such decision and estimate shall be final and conclusive, and such estimates, in case any question shall arise, shall be a condition precedent to the right of the *Contract* to receive any money due under the contract. Any doubt as to the meaning of or any obscurity as to the working of these specifications and contract will be explained by, and all directions and explanations requisite or necessary to complete, explain or make definite any of the provisions of the specifications or contract and to give them due effect, will be given by the engineer.''

''66. *Partial Payments.* The Engineer will make current estimates in writing, once each month on or before the date set by the Engineer at the time of starting the work, or from time to time as the work progresses, of the materials in place complete and the work performed in accordance with the contract, during the preceding month or period and the value thereof figured at the unit prices contracted. From the total of the amounts so ascertained will be deducted an amount equivalent to ten (10%) per centum of the whole, to

be retained by the court until after the completion of the entire contract in an acceptable manner, and the balance, or a sum equivalent to ninety (90) per centum of the whole, shall be certified by the engineer to the county court for payment, except when such balance amounts to less than five hundred dollars ($500.00). * * *''

''67. *Acceptance and final payment.* Whenever, in the opinion of the engineer, the contractor shall have completed the roadway in an acceptable manner in accordance with the terms of the contract, the engineer and the county court shall make a final inspection of the entire roadway and, upon completion of all necessary repairs or renewals, the county court shall enter an order accepting the completed roadway. The final estimate shall then be made by the engineer within 30 days of the date of the said order of acceptance or as soon thereafter as practicable, and the contractor paid the full amount due. The contractor, however, must, before said final payment is made, satisfy the court that there are no persons holding mechanic's liens, laborer's liens, or other liens against him, or claims for damages; and that there are no persons vested with the right to assert such liens or claims. The contractor, before receiving the second and subsequent monthly payments, shall show that his laborers and material men have been paid.''

''69. *Description.* Excavation and embankments shall consist of grading the roadway in conformity with the plans, true to the lines and grades given. This grading shall include all clearing and grubbing, removing structures, obstacles, etc., as indicated or directed, excavating, forming embankments, shaping and sloping, compacting and other work that may be necessary in bringing the roadway and its appurtenances to the required grade, alignment and cross-section, also the grading of all intersecting roadways, driveways and approaches, and excavating all foundations for structures. This work shall be done in accordance with these specifications.''

''72. *Roadway Excavation.* Roadway excavation shall include the removal and satisfactory disposal of all materials taken from within the limits of the work contracted for, necessary for the construction and preparation of the roadbed, embankment, sub-grade, shoul-

ders, slopes, side ditches, trenches, waterways, intersections, approaches, private entrances, etc., as indicated and directed. All suitable materials removed from the excavation shall be used so far as practicable in the formation of the embankment, sub-grade, shoulders, etc., and at such other places as directed. *All breakage and slides shall be removed by the contractor and disposed of as directed.* Ditches and waterways shall be excavated to the depth and width shown on the plans, or as may be indicated and directed. No excavated material shall be wasted without permission and when such material is to be wasted, it shall be disposed of as directed. No payment will be made for any excavated material which is used for purposes other than those designated. During the construction of the roadway the roadbed shall be maintained in such condition that it will be well drained at all times.''

''81. *Method of Determining Excavation Quantities.* All excavation will be measured in its original position by the cross-section method to ascertain the amount of material removed, which cross-sections will include all breakage or slides, not attributable to carelessness on the part of the contractor, which have been removed, and all masonry walls and stone fences. Clearing and grubbing, the removal of timber or metal fences, buildings and other obstructions will not be measured, but will be included in the price for 'EXCAVATION'.''

As the case will be remanded for a new trial mainly because of erroneous instructions, we will make no comment on the evidence further than is necessary to a proper understanding of the facts involved.

Under the contract the excavated roadway was to be twenty feet wide. As already stated, the first objection made by defendant to plaintiffs' claim is that plaintiffs changed the center line of the road at various places and that by so doing they made excavations off the original roadway as located by the line stakes, and that under section 32, above quoted, they are not entitled to payment for that excavation, inasmuch as no written authority was given for any departure from the original lines. However, defendant's engineer testifies that in certain instances he did make allowances for excavations outside the original lines. Plaintiffs show that in addition to these allowances, the excavation outside the original

lines and for which they have not been paid is 2323 cubic yards. This seems pretty clearly established. These changes not being authorized in writing, as provided in the contract, defendant claims it is not liable therefor; but plaintiffs argue that the engineer, by making allowances for part of the excavations outside the original lines, necessarily ratified the changes and made them as valid as if he had previously authorized them in writing in the first instance. Plaintiffs' contention in this regard might be correct, if the engineer were given express authority to ratify unauthorized excavations, but we find no such authority in the contract. He might under section 25 authorize deviations in the work in advance of the construction, but there is nothing which authorized him (expressly at least) to ratify deviations after the work was done, so as to entitle plaintiffs to payment therefor. *Smith* v. *Board,* 76 W. Va. 239, 85 S. E. 513. Of course, the county court could ratify and make payment therefor, but it has not done so as to the 2323 cubic yards, as shown by plaintiffs' evidence, and plaintiffs can not recover therefor.

But deducting this amount from the total claimed by plaintiffs leaves approximately 13,000 cubic yards not paid for. Defendant says it should not be required to pay for this because this excavation was rendered necessary by reason of plaintiffs' carelessness in shooting too heavy charges of powder; that the heavy shooting caused the banks to break and slide in, thus requiring the removal of extra material. Its engineer testifies that he notified Mr. Hawley, a member of the plaintiff firm, on a number of occasions that the charges used were too heavy, but this is specifically denied by him. It also appears that Hawley was located at Charleston, during the greater part of the time that the work was in progress, but that the superintendent for plaintiffs, Mr. Creekman, was on the job all the time, and had charge of the shooting, and he says that no complaint of too heavy shooting was made to him or to any employee. All who had anything to do directly with the shooting testify that no complaints were made to them, and that it was done in a proper manner. The engineer testifies that the shooting was too heavy, but he does not go into detail, showing what the size and number of the shots ought to have been anywhere. It is probable that this would

vary at different places owing to the character and quantity of the work. When he remonstrated with plaintiffs or their employees about the shooting, and they deny that he did, his remonstrances, according to his testimony, were general. It seems to be conceded that the engineer had had little actual experience in shooting when this work was done, though he had had considerable experience in road engineering. There can be no doubt that he is a competent engineer, but his testimony that the shooting was too heavy, in the absence of any detailed statement showing the proper size and number of shots that ought to have been used is not convincing. Besides, the engineer does not say that the shooting was carelessly done. No one says that. We can readily see that there might well be a difference of opinion between men experienced in such matters as to the number and size of the charges necessary or proper to shoot off the side of the mountain where this road was constructed. Under the evidence, it appears that plaintiffs' employees who did the shooting were men of long experience in that line of work and they testify it was done carefully. No one says it was done carelessly. Under section 81 of the contract it is provided that ''all excavation will be measured in its original position by the cross-section method to ascertain the amount of material removed, which cross-sections will include all breakage or slides, not attributable to carelessness on the part of the contractor, which have been removed.'' So, unless it be shown that the breakage and slides which go to make up the 13,000 cubic yards removed by plaintiffs were due to their carelessness or deliberate fraud in order to increase the yardage, then under the contract they are entitled to be paid for it. Of course, if it were shown that it was deliberately caused for the purpose of increasing the yardage, this would be a fraud upon the court. We find no evidence of bad faith. We have already shown that the evidence does not disclose it was due to careless shooting,—merely too heavy shooting, a matter of judgment only. It is not accounted for by defendant in any other way. Plaintiffs claim it was not due to careless shooting or to too heavy shooting, but to the nature of the cliff, composed of earth, stone seamed with mud and shale, and that

the breakage and slides were unavoidable. Under the evidence we can not say that the rejection by defendant's engineer of plaintiffs' claim for the approximately 13,000 cubic yards of excavation caused by breakage and slides was not capricious. This is almost one-fourth of the total amount allowed and seems so grossly out of proportion that it does not appeal to us as being equitable or fair to plaintiffs.

Defendant's chief reliance is on section 55 of the contract and the fact that the monthly and final estimates made by the engineer are binding and conclusive on the plaintiffs.

The evidence shows that the following estimates were made by him:

| | | |
|---|---|---|
| No. 1 for work done in December 1919, and January 1920 .................... | 3500 | yds. |
| No. 2 for work done in February 1920... | 7000 | yds. |
| No. 3 for work done in March 1920...... | 7000 | yds. |
| No. 4 for work done in April 1920....... | 6000 | yds. |
| No. 5 for work done in May 1920........ | 7000 | yds. |
| No. 6 for work done in June 1920...... | 6000 | yds. |
| No. 7 for work done in July 1920........ | 6000 | yds. |
| No. 8 for work done in August 1920.... | 2650 | yds. |
| No. 9 for slides, March 1921............ | 7000 | yds. |
| No. 10 for final estimate June 1921........ | 1175.4 | yds. |
| Total Estimates .................. | 53325.4 | yds. |

On the monthly estimates payments were accepted by plaintiffs, but they claim they protested to the engineer that he was not making sufficient allowances for breakage and slides, as they went along, but that he replied that he had instructions to carry that on a separate sheet and to pay when he gave them a final estimate. While the engineer denies these protests and inferentially the testimony as to carrying the breakage and slides on a separate account, and says that this was figured in the monthly estimates, on examining the estimates themselves we find but one of them shows on its face any item for breakage, and that is estimate No. 2 for 225 yards. Of course, it may have been carried into the estimate furnished each month, but the fact that it is shown as a separate item in one estimate is a circumstance to be considered. The engineer also testified that Creekman, before

he gave him the ninth estimate, told him he thought they had moved 10,000 yards of slides, with unavoidable breakage, and they needed money, so he, the engineer, gave him an estimate for 7000 yards and "took chances on it". That was after the work was practically completed. This testimony affords a strong inference that the greater part of the breakage was not included in the monthly estimates as they were given. Another strong circumstance tending to show that the monthly estimates were "estimates", and nothing more, is the fact that on their face they reveal that they are mere approximations; in every instance but one they are in round numbers of hundreds or thousands, showing that they are not the result of exact measurements. They were to serve chiefly as a basis for partial payments as the work progressed and we find nothing in the contract that gives them the binding force contended for by defendant. Even if, by the terms of the contract, the monthly estimates were to be conclusive, the conduct of the engineer shows that he did not treat them so, for after the work was practically completed, he gave an estimate of 7000 yards, in March, 1921, supposed to cover breakage and slides removed. It can not be assumed that this item covered the amount removed in the preceding month, but rather the removal of slides through the whole course of construction. There is a material difference between periodical estimates and the final estimate. The former are made chiefly to determine how much shall be paid the contractor during the progress of the work. It may be that there are other reasons for making them, but that is their main purpose. If the contractor must be on his guard when each monthly or periodical estimate is given and then and there see that it is fully checked up and all errors are corrected before accepting payment, or else be bound conclusively thereby, it ought to be expressly so stated in the contract, and so clearly expressed that there would be no room for doubt. Such a provision, if so stated, of course would be binding on the parties; but because it is so likely to hamper the progress of the work, leading to periodical disputes, temporary suspensions of the work, needless litigation, and unfairness and inequity, a court should not hold such estimates final and conclusive on the parties

unless compelled to do so by the very terms of the contract. Such a provision is quite as likely to work inequity to the owner as to the contractor. If the monthly estimates should prove to be excessive, they would result in over-payment and work a fraud upon the owner; if they should prove deficient they would result in under-payment and work a fraud upon the contractor. There is nothing in the contract in this case which makes the monthly estimates binding and conclusive upon the plaintiffs except to determine the amounts of the monthly payments they might demand; and section 68 of the contract expressly provides that the county court or the engineer "shall not be precluded or estopped by any measurement, estimate or certificate made or given by them or by any employee of the court under any provision of the contract, at any time, either before or after the completion and acceptance of the roadway and payment thereof pursuant to any measurement, estimate or certificate, from showing the true and correct amount and character of the work performed and materials furnished by the contractor, or from showing, at any time, that any such measurement, estimate or certificate is untrue or incorrectly made in any particular."

The monthly estimates not being made binding and conclusive on the plaintiffs by express and unequivocal terms of the contract, it necessarily follows that the court erred in giving defendant's instructions numbered 4, 5 and 6. No. 5, which is in many respects similar to the other two, is as follows:

"And the court further instructs the jury, that if the jury believe from the evidence that during the execution of the contract between plaintiff and defendant herein sued on, monthly estimates were made by J. D. French, the County Engineer, of the work done in accordance with the interpretations of said contract put thereon by said engineer, which were received and acquiesced in by the plaintiffs without objection, and payments made by the county court thereon, and received by the plaintiffs, the said plaintiffs will be and are estopped on final estimate and award of the engineer from putting a different construction on the said contract and from impeaching such monthly estimates or final estimates, except for fraud, mistake or caprice amounting to fraud, on the
95 W. Va.

rights of the plaintiffs; and the burden of proving such fraud, mistake or caprice on the part of said engineer, by the preponderance of the evidence is upon the party alleging or claiming the same. *Vaughan Construction Co.* v. *Virginian Ry. Co.,* 103 S. E. 293. And other cases cited above.''

Counsel for defendant rely upon the case cited in their instruction, *Vaughan Construction Co.* v. *Virginian Ry. Co.,* 86 W. Va. 440, 103 S. E. 293, to support their position, and particularly the second point of the syllabus, which reads:

"Where during the execution of such contract, monthly estimates are made by the chief engineer of the work done in accordance with the interpretation put thereon by him, which are received and acquiesced in without objection, and payments made and received by the contractor, the latter will be estopped on final estimate and award of the chief engineer from putting a different construction on the contract and from impeaching such periodical or final estimates except for fraud, mistake or caprice amounting to fraud on his rights."

We do not think this applicable to the facts in the present case. That case turned largely upon the interpretation of the contract. The contract was interpreted largely by defendant's engineer, as the work progressed; he made his monthly estimates in accordance with his interpretation; and the amount of these several estimates was to a large extent dependent upon that interpretation placed on the contract as the work progressed. It involved a classification of the material excavated and handled. For example, unclassified excavation was to be paid for at 39½ cents per cubic yard. "Riprap", a classified material, was to be paid for at $2.00 per cubic yard; under the specification it was to "consist of rough, durable stone, in general of size requiring two men to handle, deposited loosely, with crevices filled with *spalls*, and of such thickness as the engineer directs. If so required by the engineer brush shall also be used with the butts outward and down in the stream." A considerable portion of this material was used in making fills, but it was handled as unclassified excavation, not as "riprap". As the work pro-

gressed the engineer did not classify it as "riprap" but as "unclassified excavation." The contractor accepted the monthly estimates therefor without objection, knowing the material was not classified as "riprap", nor was it handled as such, and the court held he was bound thereby; but the question was one of classification under the contract, involving the interpretation thereof, not one as to quantities of material. We have re-examined the record in that case, and point two of the syllabus correctly states the law applicable to the facts therein; but it is not authority for the proposition that acceptance of monthly estimates as to quantities, without objection, estops the contractor or owner, on final accounting, from having a restatement of the account, when the contract does not in clear and express terms make the monthly estimates final.

We are therefore of opinion that it was error to give defendant's instructions Nos. 4, 5, and 6. We will reverse the judgment, set aside the verdict, and award a new trial.

*Reversed and remanded.*